H. T. HUDSON, JR., v. CHARLESTON. CINCINNATI AND CHICAGO RAILROAD COMPANY.

*Negligence—Burden of Proof—Evidence—Master and Servant.*

1. The burden is upon the servant who sues his master for damages, resulting from the use of defective machinery furnished by the latter, to establish *prima facie* (1) that the machinery was defective; (2) that the defects were the proximate cause of the injuries; and (3) that the master had knowledge of them, or might, by the proper exercise of care and diligence, have acquired such knowledge.

2. When a *prima facie* case is thus established, the burden of showing that the plaintiff knew, when he entered upon the service, or discovered, or might have ascertained by the exercise of reasonable diligence before the infliction of the injuries, that the machinery was unsafe, and continued in such service, is imposed upon the defendant. This being shown, the law adjudges it to be contributory negligence, and, upon that ground, the plaintiff cannot recover.

3. The statute (Laws 1887, ch. 33) which requires that, when contributory negligence is relied on as a defence, it shall be set up in the answer, applies to actions brought by an employee against his employer.

4. Where, therefore, the plaintiff brought suit to recover damages for injuries received while in the service of a railroad company, resulting from a defective locomotive engine, it was held to be error to instruct the jury that, if they found the engine was defective, unsafe and insecure, it devolved upon the defendant to show that its condition was not, and could not, by the exercise of reasonable care, have been known to its agents and officers.

5. The cases of *Warner* v. *Railroad Co.*, 94 N. C., 250, and *Cowles* v. *Railroad Co.*, 84 N. C., 309, commented upon and distinguished.

This is a CIVIL ACTION for damages for an injury sustained by the defendant, which was tried at August Term, 1889, of the Superior Court of CLEVELAND County, before *Connor, J.*

The plaintiff testified: "On April 29th, 1887, I was in the employ of the defendant as baggage-master. Just before reaching Black's Station, the conductor (McCarthy) told me that there was a flat-car, with brick on it, to be cut off. When we reached there, I got off to cut off, so that it could go on the side-track. I left the pin as I had been directed, so that it would be in position. I waved the fireman to go forward; instead of doing so, the engine moved back. I called to him to stop; he did so, and I went to uncouple the car again and felt the motion of the train. As I attempted to get out, I was caught. The car moved backwards; my left foot was in between the two rails; my right foot on the outside of the rail; my foot was cut off. I was instructed by Maj. Jones, the superintendent, to aid in the coupling of cars and do anything I saw to be done without waiting to be told. The signal which I gave was to go forward. The fireman was looking at me when I gave the signal. The engine was No. 16. I know nothing of the condition of the engine; I had received no notice of any defect in the engine. I knew nothing of the fireman's unfitness to run an engine; had received no notice of it. It was customary for the engineer to leave his engine and go to get orders, leaving the fireman in charge. I do not know whether we stopped on an incline or on a level. The engine was standing reversed. It was a C., C. & C. car; they were new; I saw no defect in the cars or the bumpers. I did not signal that I was going in between the cars; it was not necessary. The car was standing still. The fireman was in the cab. I stepped out six or eight steps to give the signal. When I told the fireman to stop, and he did so, he was standing in the cab. I think he had his hand on the lever. I think he could have heard me. As he stopped, I stepped in between the cars. I

had to step out some distance from the train before the fireman could see me. I gave the fireman no notice that I was going between the cars."

R. P. BRYSON for the plaintiff, testified : " I am a machinist; I work on engines; I think I understand locomotives; I repaired an engine for defendant—a horizontal engine; the one which I repaired is an old engine, badly defaced; her pump works had given away ; the valve-seat is connected with goose-neck; her frame was in bad condition— broken in two; the top section was broken ; the valve will not operate perfectly in an engine in that condition; the engineer can not control his engine. I saw the train which brought Mr. Hudson up; I saw the engine; it was running with one car. If the throttle was leaking the engine is liable to move at any time. An engine in this condition is liable to go in a direction opposite from that desired. I did the work on the engine in the spring of 1887, April or May. The engine was terribly defaced. I was called upon to turn up stud-bolts; I put it in good repair as far as I examined, or as I was directed to do. I have run a locomotive. I worked in the shop about seven months. I called the attention of Mr. Jackson to the bad condition of the engine."

MR. JACKSON testified : " I know Mr. Bryson ; he said to me that the valve of the engine was badly out of fix. I did some work on it. It was the first engine that came on the road. I think it was 16. Ferguson and Maring brought it there. I fixed it three or four times. I could tell that the engine was not exactly right by the sound."

BRYSON being recalled by plaintiff, testified : " I spoke to Jackson before Hudson was hurt."

MR. HUSKE testified : " I know No. 16, on the A. L. R. She had a kind of blow from her exhaust. She appeared to be an old engine ; was not used for passenger train. She was of about fourteen car power."

MAJ. JONES, for defendant, testified: "I am superintendent of defendant's road. Have been for three years. Prior to that time, for twelve years, I had been ·superintendent of other roads. I know No. 16. We hired it of the R. & D. R. R. about the first of April; about a month before plaintiff was hurt. She came to me right out of the shop, and in good order. At the time of the accident it was in good condition. We kept it two or three months. and returned it in good condition. We received two other engines, and had no use for it. No defects were ever called to my attention. No repairs were made while we had it, other than 'lining up.' We used it I think five months. I saw it nearly every day. The train stopped at Black's, on an incline on a grade 80 feet to the mile on a curve. The distance between the cars was 16 or 18 inches. When the cars were standing it would be about 33 inches space from the outside of the wheels. When a person is uncoupling a car he should stand with his face to the engine, straddle the rail. I employed plaintiff to go into baggage car. My instructions were to make himself useful and obey those to whom he was assigned, in this case the conductor. I put Maring in charge as engineer, and Wesley Wright as fireman. They were competent. They were well recommended. I made inquiry. The engine was on a curve turned towards Black's Station. Before we got the 16, the defendant road had two small engines; 16 was a horizontal, and the 'Arcturus.' This was the engine sent to the shop; she was pulled in with the 'Putney.' No. 16 was never in the shop. I got to the place in three minutes after the accident. I did not examine the valves. It was the action and not the looks of them that I relied upon. The cylinder head was blown out sometime after the accident. I cannot say that it was No. 16."

MR. MARING for defendant, testified: "I am fifty-one years old. Have been in the railroad service thirty-three or thirty-four years; have been engineer twenty-eight years.

I went into the employment of defendant road in September; knew No. 16. I had run it on the Air-Line When it went on defendant road the engine was in good condition. Have pulled fifteeen cars. The engine always obeyed me. I never knew of its being in the shop for repairs until after the accident. I ran it the day of the accident to Black's. It was in good condition. Wesley Wright had been in charge of the engine six or eight months. He was competent for that purpose. There was nothing in the sound of the exhaust to attract attention. She was in good condition when returned. I have seen her once. The cylinder head was blown out after the accident. It was never in Bryson's shop here. I never told anybody that it was not a good engine. Never told Mr. Kendall that it was an old engine aud ought to be thrown in the scrap-pile. I never had any work done on the engine. I never told Mr. Simmons that it was an old worn-out engine.

Mr. McCarthy, testified : " I was conductor on the defendant road at the time of the accident. I told plaintiff what was to be done at Black's. Told him to go to the switch, and told Ramsaur to cut the car off and put it on the side track. I motioned Wright, the fireman in charge of the engine, to ease back on the pin. He did so. I heard a scream. I signaled fireman to go ahead, and he did so. I ran across and found plaintiff. The box car moved about ten inches. Every brake was set. Have ridden on the engine nearly every day. It always obeyed the engineer. He did that day exactly as I told him. He came back as easily as a man could come. In uncoupling the car he should put his face towards the engine and have his hand on the ladder. He should have one foot on the inside and one on the outside. His foot was cut at the instep. He should not have uncoupled from the outside of a curve."

Mr. Ferguson, for the defendant, testified : " Began to work in the machine-shop at sixteen; worked there five years. I

am now on the defendant's road as engineer. When I first went on the defendant's road, it had three engines—'Arcturus,' 'Putney' and 'No. 16.' I carried the 'Arcturus' to the shop at which Bryson worked. Bryson repaired it—fixed the stud-bolts. It was an old engine. Have handled No. 16, switching at Black's. Two or three days before the accident its condition was good. It obeyed the movements of the lever. I handled the same engine two or three days after the accident. It was a Pittsburg engine—first-class. It had no such defect as caused it to move involuntarily. I know this from handling it. I saw the engineer; he was in the cab—right-hand side. This was the correct position. I understand the construction of an engine and the manner of operating one. I think that I am competent to express an opinion in respect to the working of an engine—the effect or defects, &c. I acquired this knowledge by working in the shop and running an engine. The leaking of a throttle-valve would not cause an engine to move in a direction opposite from that desired. If it was allowed to stand leaking, it might move a little—about one revolution. The steam would pass into a cold chamber. The effect of a leak in the throttle is to require more fuel. The engine would move in the direction in which the lever was set. If the steam is in front of the piston, it will make a revolution to get out. The direction in which it would move would depend upon the way the lever was set. Bryson was in the shop. Gardner and Jackson were there. I know that No. 16 was not carried to the shop. No. 16 was the first engine on the road. Mr. Maring ran No. 16 to the construction train before the other engines came. It was not sent to the shop, to my knowledge.

The defendant offered much other testimony contradictory of that introduced by the plaintiff, and particularly tending to show that the engine was not defective, and that plaintiff by his own carelessness was the cause of the accident.

HUDSON *v.* RAILROAD.

JOHN LINEBERGER, for plaintiff, testified: "I know Mr. Maring, engineer. I saw him at the depot working on the engine, tightening it up. He said the d——d old thing was no good. He wished the new one would come in. This was before Hudson was injured. I saw him at work on it several times."

MR. KENDALL, for plaintiff, testified: "I heard Mr. Maring say that it was an old worn-out engine that they had got from the Air-Line Railroad; that it was no account and ought to be thrown on the scrap-pile."

MR. JACKSON, for plaintiff, testified: "Maring said to me the d——d old engine was worn out; that they ought to get a new one. Ferguson tried to get me to work on the engine twice."

MR. SULLIVAN, for the plaintiff, testified: "I heard Maring curse the engine, and said that it was no account—an old one which they got from the Air-Line road; I saw him work on the throttle frequently."

R. L. SIMMONS, for the plaintiff, testified: "I am acquainted with Mr. Maring. I rode on the engine with him before plaintiff was hurt. I was with him one night on the engine. It stopped. He said that it was an old engine—no account."

The Court instructed the jury, in addition to other instructions, not material, as follows:

3. The defendant was bound to exercise reasonable care, caution and diligence, in seeing that the engine was suitable and safe. If it failed in this respect, and, as a consequence of such failure, the plaintiff was injured without fault upon his part, it would be your duty to answer the 4th issue in the affirmative.

The burden of proof in respect to this issue is upon the plaintiff.

4. If you find that the engine was defective, unsafe, and insecure, it devolves upon the defendant to show that its

104—32

condition was not, and could not, by the exercise of reasonable care and caution, have been known to its officers and agents.

The defendant asked for the following instructions, which were given by the Court:

"7. That an employee of a railroad company, when he enters the service of the company and undertakes the business of uncoupling cars, assumes the ordinary risks incident to such employment.

8. If the jury find that the plaintiff and the defendant are mutually in fault, the negligence of both being the immediate and proximate cause of the injury, then they will answer Yes to the 6th issue.

12. If the jury find that the engine was defective, unsafe, and insecure, they cannot respond Yes to the 4th issue unless they are further satisfied, by a preponderance of the testimony, that the defect in the engine was the cause of the injury.

13. Before this jury can respond Yes to the 4th issue, they must be satisfied, by the preponderance of the testimony, not only that the engine was defective, but that such defect rendered the engine unsafe and insecure.

14. Although the jury shall find that the plaintiff was injured by the defect of the engine, yet if he could by reasonable care and prudence have averted the accident, and the injury can be traced to his own negligence, as well as that of defendant, he cannot recover, and the jury will answer Yes to the 6th issue"

The defendant asked for the following instructions, which were refused:

"18. There is no evidence that the injury was caused by a defect in defendant's engine.

19. There is no evidence that the engine of defendant was unsafe or dangerous, or that it was in such a condition that

it was negligence on the part of the defendant to allow it to be used on the road or its trains.

21. The burden of proof on all the issues, except the 6th issue, is on the plaintiff, and he must establish the affirmative thereof by a preponderance of the testimony."

The first, second and third issues were answered in the negative by consent of the parties.

The defendant duly excepted to the instructions which his Honor gave at the request of the plaintiff, as above set forth, and to each of them separately.

The jury rendered a verdict upon the issues as set forth in the record and in this case.

The defendant moved for a new trial upon the following grounds:

1. That the Court admitted incompetent testimony, which was duly objected to, and set forth in this case.

2. That the Court gave improper and erroneous instructions to the jury, at the request of plaintiff, which are above set forth, and which were separately excepted to. This assignment of error is made to each instruction given at the request of the plaintiff, and also to the instructions so given as a whole.

3. That the Court refused to give the instructions asked for by the defendant, as above set forth, or any one of them.

4. That the Court refused to give other instructions asked for by the defendant, but modified the same as above set forth. The motion of defendant for a new trial was overruled, and from the judgment rendered the defendant appealed.

The following are the issues submitted, with responses of the jury to each:

1. Was the injury to plaintiff caused by the negligence of a servant of defendant; if so, which one? Answer: No.

2. Was the servant, by whose negligence the injury was caused, unskillful and incompetent; and was such incompetency known to defendant at the time of his employment? Answer: No.

3. Did the defendant retain such servant in its employment after notice of his incompetency? Answer: No.

4. Was the injury caused by the unsafe, defective and insecure character of the engine of defendant? Answer: Yes.

5. Was such defect known to defendant, or could it have been ascertained by the exercise of ordinary care? Answer: Yes.

6. Did plaintiff, by his own negligence, contribute to the injury? Answer: No.

7. What damage, if any, did plaintiff sustain by reason of the injury? Answer: $8,000.

*Messrs. W. A. Hoke* and *C. W. Tillett*, for the plaintiff.
*Mr. Platt D. Walker*, for the defendant.

AVERY, J.—after stating the facts: Where a servant rests his claim to damages against his employer upon the ground that he has been injured by defective machinery, furnished by the master to be used in the course of his employment, the burden is cast upon him, as plaintiff, to prove negligence *prima facie*, or subject himself to judgment of nonsuit. It is a well settled rule that he cannot relieve himself of the *onus* thus imposed upon him until he offers testimony tending to show:

1. That the appliance or machinery was defective.

2. That the injury was due to such defect as the proximate cause.

3. That the attention of the master had been called to the defect, or that, in the exercise of a degree of care, commensurate with the character of the machine, he ought

to have had knowledge of it. Thompson on Neg., p. 996, § 12; *ibid.*, p. 984, § 11 (2); *Gibson* v. *The R. R Co.*, 46 Mo., 163; *M. & O. Railroad Co.* v. *Thomas*, 42 Ala. Rep., 672.

Some writers, who are generally recognized as authority, contend that the servant is required to show affirmatively, also, that he did not know of the fault in the machinery to which the injury was due, and that it was not so apparent that he could, with ordinary observation, have discovered it. 3 Hard. R. L. Cases, § 385; Woods' Law of M. & S., § 382; Beach on Con. Neg., § 123. The weight of authority, as well as the force of sound reasoning, sustain the rule, however, that it is incumbent on the defendant—if it would avoid liability for injuries caused by machinery furnished to the servant, when its agents knew, or ought to have known, of its dangerous condition—to aver in the answer, and to prove on the trial, that the latter knew when he entered the service, or discovered during the term of service and before he was injured, or by the exercise of ordinary observation or reasonable skill and diligence in his department of service, might have known that the appliance complained of was unsafe. 2 Thomp. on Neg., p. 1008, § 15; *Onus Probandi*, 127, 128; *Greenleaf* v. *Illinois Central Railroad Co.*, 29 Iowa, 14. In Shearman & Redfield on Negligence (§ 99) the rule as to the *onus probandi*, in cases of this kind, is stated as follows: "In actions brought by servants against their masters, the burden of proof as to the master's knowledge, or culpability in lacking knowledge, of the defect which led to the injury, whether in the character of a fellow-servant or the quality of the material used, rests upon the plaintiff. But the plaintiff, having proved the fault of the master in this respect, the burden of proving that the plaintiff also knew of such defect, and commenced, or continued, his service with such knowledge, rests upon the defendant. This fact being proved, it is then for the plain-

tiff to show, if he can, that the defendant induced him to continue his work by promising to remedy the defect."

While a servant, in contemplation of law, contracts with reference to the danger of injury from fellow-servants in a common employment, and to the peril incident to the use of unsafe appliances, to which his attention is called before contracting, yet, if he first discovers this dangerous condition, after accepting employment, and wilfully continues to incur the risk incident to the service, such voluntary exposure of his person is held to be contributory negligence on his part, and he is held not to be entitled to recover damages for an injury due to such defects, because of his own carelessness, and not on the ground that he agreed to sub-ject himself to hazards of which he could not have known. Patterson R. & L., § 327; Wharton on Negligence, § 197; *Pleasants* v. *Railroad Co.*, 95 N. C., 195. Our statute (Laws of 1887, ch. 33) requires that contributory negligence, when relied on as a defence, shall be set up in the answer and proved on the trial, and makes the rule applicable where an action is brought by an employee against his employer. We think, therefore, that his Honor erred when he instructed the jury, that if they found that the engine was defective, unsafe, and insecure, it devolved upon the defendant to show that its condition was not, and could not, by the exercise of reasonable care and caution, have been known to its officers and agents. The learned Judge, who tried the case, seems to have been misled by misconstruing the language used by the Court in *Warner* v. *Railroad Co.*, 94 N. C., 250. The burden of proof was not directly, nor, as we conceive, even incidentally, discussed in that case. The questions were, first, whether complaint contained a statement of facts sufficient to constitute a cause of action; and, second, whether, if it was a defective statement of a cause of action, the answer was such that the doctrine of aider applied so as to cure any defect in the complaint. The Court decided, upon

the first point, that the complaint contained a sufficient statement of a cause of action, when the plaintiff alleged, in the third and fourth paragraphs, that the defendant company "conducted itself so carelessly, negligently and unskillfully, in this behalf, that it provided and used an unsafe, defective and insecure locomotive," and "that for want of due care and attention to its duty in that behalf, &c., * * * the boiler, connected with the engine of said locomotive, by reason of the unsafeness, defectiveness and insecurity thereof, exploded," in consequence of which explosion plaintiff's intestate was killed "without any negligence or want of care on his part." It was held, in substance, that this was a sufficiently specific declaration that the death was caused by the carelessness of the defendant, and that the fact that the defendant either knew, or, by the exercise of ordinary care, might have ascertained, the dangerous condition of the engine, was evidence to sustain the general allegation of carelessness, in providing defective machinery for the servants of the company, but was not an essential part of the allegation itself.

The second point decided was, that if the complaint contained a defective statement of a cause of action, the defendant had averred in his answer, first, that the engine had been repaired and was in good condition; and, second, that if it was unsafe, when it exploded, it became so after it was repaired and inspected, "without the knowledge thereof on the part of the defendant," and the defects were cured under the rule as to aider.

In the case of *Cowles* v. *R. R. Co.*, 84 N. C., 309, it is true that the Judge who tried the case below, instructed the jury that it was the duty of the defendant company "to furnish safe cars, supplied with necessary machinery and appliances to render them secure, and, if the jury believed that it had failed in this, and thereby the plaintiff had been injured, without any neglect or want of skill on his part, then they

should find the issues submitted in favor of the plaintiff, without regard to the conduct of the engineer." But the Court say: "The defendant's exception, as argued before us, *does not go to any portion of his Honor's charge as given, but only to his refusal to give that specially asked for."* The instruction asked was intended to raise the question whether the testimony did not disclose the fact that the injury was due to the carelessness of a fellow-servant of the plaintiff. It was, therefore, entirely unnecessary that this Court should determine whether the charge of the Judge was erroneous, for failure to tell the jury that it was incumbent on the plaintiff to show that the defendant company either knew, or by reasonable diligence, might have discovered, the condition of its cars. The Court declared that the testimony was too meagre to determine whether the engineer occupied the relation of fellow-servant to the plaintiff, and, as the defendant had failed to show error, the verdict must stand. In the discussion of abstract principles that follow this announcement, the Court used the language which, counsel insist, imposes liability on a railroad company for injuries to its employees caused by unsafe machinery, whether the company had either notice or opportunity to discover the defect or not. We understand the Court to have assumed in the argument in that case, that the company did know of the dangerous condition of the cars because, upon the admitted facts, the defect was so obvious that it must have been seen on inspection. This view seems clearly correct, when we consider that the learned Justice who delivered the opinion said, in conclusion, in reference to the case of *Gibson* v. *The R. R. Co.,* 46 Mo., 163: "This last case has been treated by Thompson in his work on Negligence as a leading one on those subjects, and we think that our conclusions in this case are in accord with the principles enunciated in those cases." The Judge who tried that case below told the jury that if they found, "from the evidence, that the appa-

ratus for coupling by which the plaintiff was injured, from its make and construction was unsafe, and *the defendant knew thereof, or might have known thereof, by the exercise of reasonable care and diligence,* the defendant is liable," &c. (see p. 167). In commenting upon this instruction, which had been excepted to, the Appellate Court said (p. 167): " But the instruction given for the respondent is well supported by authority and is founded on reason. "*If, by reasonable and ordinary care and prudence, the master may know of a defect in the machinery he operates,* it is his duty to be advised, and not needlessly expose his servants or employees to hazard, peril or mutilation." The qualification as to the liability of the master in this case is, therefore, the same given by Thompson, Wharton, Beach, Wood, and other leading text writers, and insisted on by the defendant in the prayer for instruction.

It is not essential that we should consider any of the other errors assigned, but as the case may come before us again it is best to advert to two other exceptions. We think there was no error in refusing to charge, as requested, that there was no evidence that the engine was unsafe or defective, or that the injury was caused by the dangerous condition of the engine. The testimony of the witnesses Hudson, Ferguson, Huske, Jackson and Sullivan tended to show that the engine was in a dangerous condition; and that of Bard, Bynum, Murray and Hudson that the injury might have been due to the fact that it was not subject to the control of the engineer. It is not within our province to pass upon the weight of the evidence. We only decide that it was sufficient to require the Court to submit the case to the jury. There was error in the instruction as to the burden of proof, for which there must be a new trial.